United States District Court
Eastern District of Michigan

United States of America,

     Plaintiff,               Civil No.

v.

Zachery Keeler, dba Even Keel
Exotics, LLC.

     Defendant.

---

## Complaint for Declaratory and Injunctive Relief

---

Plaintiff, United States of America, by authority of the Attorney General of the United States and through its undersigned attorneys, files this Complaint and alleges as follows:

### INTRODUCTION

1.    This is a civil action against Zachery Keeler for violations of the Animal Welfare Act ("AWA") and its implementing regulations and standards, and Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1), (g), and its implementing regulations.

2.    Mr. Keeler operates a facility in Temperance, Michigan, where he exhibits and sells numerous species of animals. Mr. Keeler holds an AWA

1

license to purchase, resell, and breed certain animals regulated under the AWA that was issued by the U.S. Department of Agriculture ("USDA"). However, Mr. Keeler's repeated attempts to avoid federal inspection and oversight have resulted in needless and substantial harm to the animals in his care.

3.      Congress enacted the AWA for a number of purposes, including to ensure that animals used for exhibition purposes or held for sale are provided humane care and treatment. 7 U.S.C. § 2131. The AWA imposes "minimum requirements" for handling, housing, feeding, watering, sanitation, and adequate veterinary care, among other requirements. *Id.* § 2143(a)(2)(A).

4.      A cornerstone of AWA enforcement is the unannounced inspection conducted by the USDA Animal and Plant Health Inspection Service ("APHIS"), which allows APHIS officials to accurately assess a licensee's compliance with the AWA, its regulations, and its standards, and ensure the wellbeing of AWA-regulated animals.

5.      Licensees are required during business hours to allow APHIS officials to enter the place of business to inspect and photograph the facilities, property, and animals. 9 C.F.R. § 2.126(a). And yet Mr. Keeler has failed to grant APHIS officials access to the Even Keel Exotics facility 13 out of the 23 times APHIS officials have attempted to inspect the facility between March 2021 and July 2023. *See e.g.,* Exhibit X. Mr. Keeler failed to provide APHIS officials access

2

to the Even Keel Exotics facility eight times in a row, preventing APHIS officials from inspecting the facility, records, and, most importantly, the animals, from August 9, 2022, until he provided access to APHIS officials on June 29, 2023. *See* Exhibits M, N, O, P, Q, R, S, T.

6.      When Mr. Keeler finally provided access to the Even Keel Exotics facility on June 29, 2023, APHIS officials observed violations of 20 different provisions of the AWA and its implementing regulations and standards.[1] *See* Exhibits U, V. The violations included five citations for the most serious types of noncompliant items related to five cats and eight kittens at Even Keel Exotics. Exhibit U. APHIS officials observed one adult female cat, nursing four kittens, who was very thin with prominent hip bones. *See* Exhibit U at 2; *see also* photo below.



---

[1] The inspection reports from the June 29, 2023 inspection, the July 7, 2023 inspection, and the July 18, 2023 inspection may still be appealed by Mr. Keeler.

7.      The adult female cat and her four nursing kittens had no food or potable water. Exhibit U at 3. When APHIS officials directed Mr. Keeler to provide food, the adult female cat ate for two minutes, while the four kittens ate for at least four minutes. In another enclosure, another adult female cat and her four kittens had no water. *See id.* at 3-4. When APHIS officials directed Mr. Keeler to provide them water, the adult female cat drank for over three and a half minutes, and two of the kittens drank for at least 45 seconds. *Id.*

8.      Mr. Keeler claimed that the cats and kittens belonged to his son who he stated was away at camp and had been gone for 10 days. Upon information and belief, Mr. Keeler's son is a minor. However, these are the only kittens at Even Keel Exotics, and a kitten is featured on Even Keel Exotic's advertisement for Baby Animal Day, which is a regulated activity under the AWA. *See* Exhibit U at 5; *see also* photo below.



9.      When APHIS officials returned to the Even Keel Exotics facility on

July 7, 2023, to check on the health and wellbeing of the cats and kittens, Mr.
Keeler became argumentative and stated that, if the APHIS officials entered the
building where the animals were located, he would consider the APHIS
officials to be trespassing. He was cited for interference with the inspection,
which APHIS officials then ended. *See* Exhibit W.

10.     APHIS officials returned on July 18, 2023, to assess the condition of
the cats observed on June 29, 2023. Mr. Keeler once again failed to provide the
APHIS officials access to the Even Keel Exotics facility in violation of 9 C.F.R.
§ 2.126. *See* Exhibit X.

11.     During the June 29, 2023 inspection, Mr. Keeler also failed to provide
complete and accurate disposition records regarding animals that were no
longer at Even Keel Exotics, as required under the AWA, 9 C.F.R. § 2.75(b)(1).
The records were missing key information including the name and address of
the person who purchased the animals or the species sold. Exhibit V at 2. Mr.
Keeler's refusal to provide access to the Even Keel Exotics facility and failure
to provide accurate records regarding the movement of his animals make it
impossible for the government to ensure the health, wellbeing, and lawful
transfer of the animals involved and prevents USDA from tracking the animals
in the case of a disease outbreak.

12.     When Mr. Keeler has provided APHIS officials access to the Even

Keel Exotics facility, APHIS officials consistently observe serious noncompliances, often including the failure to provide animals potable water. *See* Exhibits B at 2, 4; F at 2, 3; H at 2; J at 3-4.

13.     On July 18, 2023, the APHIS Acting Administrator suspended Defendant's AWA license, number 34-B-0225, for 21 days. Exhibit Y. The suspension went into effect on July 18, 2023, when it was served by APHIS officials on Mr. Keeler at Even Keel Exotics. The suspension notice states that, during the period of the suspension, it will be a violation of the AWA regulations to "buy, sell, transport, exhibit, or deliver for transportation, any 'animal' as that term is defined in the Act and the Regulations." *Id.* at 2. The prohibition "applies to [Mr. Keeler] and to any employee, agent or other person acting on [his] behalf." *See id*.

14.     USDA also filed an administrative complaint seeking permanent revocation of AWA license 34-B-0225 on July 18, 2023.

15.     Even Keel Exotics also has, in violation of the ESA, prematurely separated an endangered ring-tailed lemur pup who upon information and belief is barely two months old from its mother, resulting in the harm and harassment and, therefore, unlawful take of both lemurs.

16.     In violation of the ESA, Even Keel Exotics has attempted to sell the unlawfully taken ring-tailed lemur pup.

17.    For the following reasons, the United States complains and seeks a temporary restraining order as well as other injunctive relief.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction over this action pursuant to 7 U.S.C. § 2146(c) (actions arising under the AWA); 16 U.S.C. § 1540(c) (actions arising under the ESA); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1345 (United States as plaintiff).

19.    Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391.

20.    The Court may grant the requested relief under the AWA, 7 U.S.C. §§ 2146(c), 2159; ESA, 16 U.S.C. § 1540(e); and 28 U.S.C. §§ 2201, 2202 (declaratory and injunctive relief).

## THE PARTIES

21.    The Plaintiff is the United States of America. Authority to bring this action is vested in the Attorney General of the United States pursuant to 28 U.S.C. §§ 516, 519; 7 U.S.C. §§ 2146(c), 2159; and 16 U.S.C. § 1540(e)(6).

22.    Upon information and belief, Defendant Zachery Keeler is a resident of Monroe County, Michigan. Mr. Keeler holds AWA dealer license 34-B-0225. Under license 34-B-0225, Mr. Keeler may engage in regulated activity authorized by a valid class B license at 2516 West Rauch Road, Temperance,

Michigan ("Temperance Facility").[2]

23.     Even Keel Exotics, LLC is registered as a Michigan limited liability company whose business mailing address is 2516 West Rauch Road, Temperance, Michigan. Mr. Keeler is the resident agent of Even Keel Exotics, LLC. Even Keel Exotics is listed as the organization Mr. Keeler is using to conduct business under license 34-B-0225.

24.     Upon information and belief, Mr. Keeler owns, exhibits, and sells the animals that are the subject of this action at the Temperance Facility, which is located in the Eastern District of Michigan.

## LEGAL BACKGROUND

### I.  The Animal Welfare Act

25.     The AWA establishes minimum standards of care and treatment to be provided for certain animals bred and sold for use as pets, transported commercially, or exhibited to the public.  7 U.S.C. § 2131 *et seq*.

26.     The AWA is administered by the Secretary of Agriculture or his representative. 7 U.S.C. §§ 2132 (b), 2146. The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." *Id*. § 2151. The Secretary has

---

[2] Defendant cannot lawfully engage in any regulated activity during the period of the suspension issued on July 18, 2023. *See* Exhibit Y.

delegated his authority to the APHIS Administrator.

27.    The AWA defines a "dealer" as "any person who, in commerce, for

compensation or profit, delivers for transportation, or transports, except as a

carrier, buys, or sells, or negotiates the purchase or sale of" any "animal

whether alive or dead for research, teaching, exhibition, or use as a pet." 7

U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definition of dealer).

28.    A class "B" licensee means a person who meets the definition of

"dealer" and "whose business includes the purchase and/or resale of any

animal." A class "B" licensee may also exhibit animals as a minor part of the

business. 9 C.F.R. § 1.1 (definition of class "B" licensee).

29.    A "person" includes any "individual, partnership, firm, joint stock

company, corporation, association, trust, estate, or other legal entity." 7 U.S.C.

§ 2132(a).

30.    Anyone who falls within the statutory definition of a dealer must

obtain and maintain a valid license from the Secretary. 7 U.S.C. § 2134; *see

also* 9 C.F.R. § 2.1(a)(1) (licensing requirements).

31.    The Secretary shall issue a license to a dealer upon application,

provided that no such license shall be issued until the dealer has demonstrated

that his facilities comply with the standards promulgated by the Secretary

pursuant to 7 U.S.C. § 2133.

32.     By signing the application form, the applicant acknowledges that he has reviewed the AWA and its regulations and standards and "agrees to comply with them." 9 C.F.R. § 2.2.

33.     The AWA makes it unlawful for any dealer to knowingly violate the AWA. 7 U.S.C. § 2149(d).

34.     The Secretary has promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by dealers, which includes the minimum requirements "for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species." 7 U.S.C. § 2143(a)(1)-(a)(2)(A).

35.     When construing or enforcing the provisions of this chapter, the act, omission, or failure of any person acting for or employed by a dealer is deemed the act, omission, or failure of the dealer. 7 U.S.C. § 2139.

36.     With regard to water, if potable water is not accessible to the animals at all times, potable water must be provided as often as necessary for the health and comfort of the animal, taking into account the age, species, condition, size, and type of animal. 9 C.F.R. § 3.130. Potable water must be offered to cats as often as necessary to ensure their health and wellbeing, but not less than twice daily for at least one hour each time, unless restricted by the attending

veterinarian. 9 C.F.R. § 3.10(b). Water receptacles must also be kept clean and sanitized. 9 C.F.R. §§ 3.10(c), 3.55.

37.     With regard to sanitation, excreta must be removed from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors. 9 C.F.R. § 3.131(a).

38.     With regard to facilities, the AWA requires that indoor and outdoor housing facilities be structurally sound and maintained in good repair to protect animals from injury and to contain the animals.  9 C.F.R. § 3.125(a).  Further, all outdoor housing facilities must be enclosed by a perimeter fence that is constructed so that it protects the animals by restricting animals and unauthorized persons from going through it or under it. 9 C.F.R. § 3.127(d).

39.     With regard to veterinary care, each dealer must establish and maintain programs of adequate veterinary care that include, but are not limited to, "[t]he use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care," *id.* § 2.40(b)(2), and daily observation of all animals to assess their health and wellbeing, *id.* § 2.40(b)(3).  While the daily observation can be accomplished by someone other than the attending veterinarian, there must be a mechanism of direct and frequent communication so that timely and accurate

information of problems of animal health, behavior, and wellbeing is conveyed to the attending veterinarian. *Id.*

40. With regard to records, each dealer must make, keep, and maintain records or forms for at least one year which fully and correctly disclose information concerning each animal other than dogs or cats, purchased or otherwise acquired, owned, held, leased, or otherwise in his or her possession or under his or her control, or which is transported, sold, euthanized, or otherwise disposed of by that dealer. 9 C.F.R. §§ 2.75(b)(1), 2.80; 7 U.S.C. § 2140. The records must include: the name and address of the person from whom the animals were purchased or otherwise acquired; the USDA license or registration number of the person if he or she is licensed or registered under the Act; the vehicle license number and State, and the driver's license number (or photographic identification card for nondrivers issued by a State) and State of the person, if he or she is not licensed or registered under the Act; the name and address of the person to whom an animal was sold or given; the date of purchase, acquisition, sale, or disposal of the animal(s); the species of the animal(s); and the number of animals in the shipment. 9 C.F.R. § 2.75(b)(1)(i)-(vii).

41. The AWA sets parameters and restrictions on the public exhibition of animals. "Animals shall be exhibited only for periods of time and under

conditions consistent with their good health and well-being." *Id.* § 2.131(d)(1).
During public exhibition, an animal must be handled so there is minimal risk of
harm to the animal and to the public, "with sufficient distance and/or barriers
between the animal and the general viewing public." 9 C.F.R. § 2.131(c)(1). In
particular, "[y]oung or immature animals shall not be exposed to rough or
excessive public handling or exhibited for periods of time which would be
detrimental to their health or well-being." 9 C.F.R. § 2.131(c)(3).

42.    A licensee must, during business hours, allow APHIS officials: to
enter its place of business; to examine records required to be kept by the Act
and the regulations in this part; to make copies of the records; to inspect and
photograph the facilities, property, and animals, as the APHIS officials consider
necessary to enforce the provisions of the Act, the regulations, and the
standards in this subchapter; and to document, by the taking of photographs and
other means, conditions and areas of noncompliance. 9 C.F.R. § 2.126(a).

43.    A licensee must, during business hours, make a responsible adult
available to accompany APHIS officials during the inspection process. 9
C.F.R. § 2.126(b).

44.    The AWA requires the Secretary to make investigations and
inspections as necessary to determine whether any exhibitor has violated any
provision of the AWA or any regulation or standard issued thereunder. 7

U.S.C. § 2146(a).

45.    A licensee shall not interfere with, threaten, abuse (including verbally

abuse), or harass any APHIS official in the course of carrying out his or her

duties. 9 C.F.R. § 2.4.

46.    Whenever the Secretary has reason to believe that any dealer is

placing the health of any animal in serious danger in violation of the AWA or

regulations or standards issued thereunder, the Secretary shall notify the

Attorney General, who may seek an injunction in the United States district

court.  7 U.S.C. § 2159(a).

47.    Under the AWA, United States district courts "are vested with

jurisdiction specifically to enforce, and to prevent and restrain violations of [the

AWA], and shall have jurisdiction in all other kinds of cases arising under [the

AWA]," except in one instance not applicable here. 7 U.S.C. § 2146(c).

**II. Endangered Species Act**

48.    The AWA and ESA are distinct but complementary statutes, each

with its own scope, purpose, and enforcement mechanisms. The AWA provides

for a minimum standard of care and treatment for certain animals being sold or

exhibited, whereas the ESA provides for additional, heightened protections that

apply to specific protected animals, including endangered ring-tailed lemurs,

whether or not the animals are used in commerce.

49.     Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such [species]." 16 U.S.C. § 1531(b).

50.     The ESA defines an "endangered species" as "any species which is in danger of extinction." 16 U.S.C. § 1532(6).

51.     Except as authorized by permit, the ESA prohibits the "take" of any endangered species within the United States.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.21(a), (c)(1). It likewise prohibits any person subject to the jurisdiction of the United States from attempting to take, soliciting another to take, or to cause an endangered species to be taken. 16 U.S.C. § 1538(g); 50 C.F.R. §§ 17.21(a), 17.31(a), (c).

52.     The ESA defines the term "person" to include "an individual, corporation, partnership, trust, association, or any other private entity." 16 U.S.C. § 1532(13).

53.     The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

54.     The term "harass" is defined by regulation to include an "intentional or negligent act or omission which creates a likelihood of injury to wildlife by

15

annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.  The definition, when applied to captive wildlife, does not include generally accepted: (1) animal husbandry practices that meet or exceed the minimum standards for facilities and care under the AWA; (2) breeding procedures; or (3) provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife. *Id.*  The term "harm" is defined by regulation as an act which "kills or injures" wildlife.  *Id.*

55.     Under the ESA, it is also illegal to possess, sell, deliver, carry, transport, or ship any unlawfully taken endangered species.  16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d), 17.31(a). It likewise prohibits any person subject to the jurisdiction of the United States to attempt to commit, to solicit another to commit, or to cause to be committed these prohibited acts with such endangered or threatened species. 16 U.S.C. § 1538(g); 50 C.F.R. § 17.21(a).

56.     The ESA authorizes the Secretary of the Interior to issue a permit for any act that is otherwise prohibited by 16 U.S.C. § 1538 but, as relevant here, only if such act is "for scientific purposes or to enhance the propagation or survival of the affected species" and other strict requirements are met.  16

U.S.C. § 1539(a)(1)(A), (c), (d).

57.     All fish or wildlife taken, possessed, sold, purchased, offered for sale or purchase, transported, delivered, received, carried, shipped, exported, or imported contrary to the provisions of the ESA, any regulations made pursuant thereto, or any permit or certificate issued hereunder shall be subject to forfeiture to the United States. 16 U.S.C. § 1540(e)(4)(A).

58.     Ring-tailed lemurs, *Lemuridae catta*, are listed as "endangered." 50 C.F.R. § 17.11(h); 35 Fed. Reg. 8,491 (June 2, 1970).

## FACTUAL BACKGROUND

59.     Mr. Keeler holds a USDA class B license. By signing the application form for the license, he acknowledged that he had reviewed the AWA and its implementing regulations and standards and agreed to comply with them. *See* 9 C.F.R. § 2.2.

60.     Since March 2021, Mr. Keeler has failed to grant APHIS officials access to the Even Keel Exotics facility 13 out of the 23 times APHIS officials have attempted to inspect the facility. *See* Exhibits E, G, I, K, M-T, X.

61.     Of the inspections completed by APHIS officials during that period, seven out of eleven inspections had at least one critical or direct citation.[3] *See*

---

[3] As relevant here, a "critical" noncompliance is one that has a "serious or severe adverse effect on the health and well-being of the animal[s]." Animal Welfare

Exhibits B, C, F, H, J, U, W.

62.     From August 9, 2022, through May 18, 2023, Mr. Keeler failed to

grant APHIS officials access to the Even Keel Exotics facility eight consecutive

times. *See* Exhibits M-T.

63.     On June 29, 2023, Mr. Keeler allowed APHIS officials to inspect the

Even Keel Exotics facility for the first time since May 13, 2022.

64.     During the June 29, 2023 inspection,[4] APHIS officials identified five

direct and two critical noncompliances. *See* Exhibit U.

65.     On July 7, 2023, APHIS officials arrived at the Even Keel Exotics

facility to deliver part of the June 29, 2023 inspection report which contained

noncompliances that were designated non-critical and to re-inspect the direct

and critical noncompliances from the part of the report delivered to Defendant

---

Inspection Guide, USDA, 2-8 (revised Dec. 2022),
https://www.aphis.usda.gov/animal_welfare/downloads/Animal-Care-
Inspection-Guide.pdf ("APHIS Animal Welfare Inspection Guide") (last visited
July 20, 2023). A "direct" noncompliance is a critical noncompliance that is having
a serious or severe adverse effect on the health and wellbeing of the animal at the
time of the inspection. *Id.* at 2-9.

[4] A "routine" inspection is an unannounced, complete inspection of every aspect of
the facility that is regulated under the AWA. A "focused" inspection may include:
re-inspection for direct noncompliances identified during a previous inspection; re-
inspection for a specific noncompliance identified during a previous inspection; a
partial inspection of the facility, such as animals only or records only; or a partial
inspection to follow up on a public complaint concerning animal welfare. *See*
APHIS Animal Welfare Inspection Guide at 3-24–25.

on June 30, 2023.

66.    During the July 7, 2023 inspection, APHIS officials requested the opportunity to inspect the cats and kittens observed during the June 29, 2023 inspection. Mr. Keeler stated the cats were not his, APHIS officials would be trespassing if they entered the building, and that he did not have keys to the building. APHIS officials asked Mr. Keeler multiple times for entrance to the building, however, he continued to state that they would be trespassing if they entered the structure where the cats and kittens were located. *See* Exhibit W.

67.    APHIS officials returned to the Even Keel Exotics facility at approximately 8:55 AM on July 18, 2023, but Mr. Keeler once again failed to provide access to the facility, stating by phone that he was unavailable to conduct an inspection. *See* Exhibit X.

68.    Because APHIS officials were not able to assess the health and welfare of the cats that were observed to be in poor condition on June 29, 2023, APHIS determined that the cats are in serious danger, *see* 7 U.S.C. § 2159(a).

**I.    Even Keel Exotics Has Violated the AWA by Failing to Allow APHIS Officials Access to the Place of Business, to Examine Records Required to be Kept by the AWA and its Regulations, and to Inspect the Facilities and Animals.**

69.    Since January 2021, Mr. Keeler has failed thirteen times to provide APHIS officials with access to his place of business and records during business hours to conduct an inspection or make a responsible adult available to

accompany APHIS officials during the inspection process.

70.     On or about November 30, 2021, at approximately 1:29 PM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he informed them he was off site and would not be available for an inspection that day. Exhibit E.

71.     On or about February 17, 2022, at approximately 10:26 AM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he informed them he was off site and would not be available for an inspection that day. Exhibit G.

72.     On or about March 23, 2022, at approximately 10:13 AM, a responsible adult was not available to accompany APHIS officials during the inspection process. Mr. Keeler did not answer the telephone when contacted by APHIS officials at that time. When subsequently contacted, Mr. Keeler's wife informed APHIS officials that he was out of town and would not be available for an inspection that day. Exhibit I.

73.     On or about May 3, 2022, at approximately 10:18 AM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time,

he informed them he "forgot to call and say he was out of town" and that he had "no one [t]here" that day. Exhibit K.

74.     On or about August 9, 2022, at approximately 1:05 PM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he informed them he was unable to conduct an inspection that day. Exhibit M.

75.     On or about October 18, 2022, at approximately 1:06 PM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he informed them he was unavailable to conduct an inspection that day. Exhibit N.

76.     On or about December 6, 2022, at approximately 1:52 PM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he informed them he was unavailable. Mr. Keeler acknowledged an employee was present at the facility, however, he would not authorize anyone else to complete the inspection. Exhibit O.

77.     On or about January 10, 2023, at approximately 1:03 PM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at

that time, he informed them he was unavailable to conduct an inspection that

day. Exhibit P.

78.     On or about January 31, 2023, at approximately 1:02 PM, a

responsible adult was not available to accompany APHIS officials during the

inspection process. When APHIS officials contacted Mr. Keeler by telephone at

that time, he did not answer. APHIS officials subsequently contacted Mr.

Keeler's wife by telephone, and she informed them he was out of town and

would not be available for an inspection that week. Exhibit Q.

79.     On or about March 14, 2023, at approximately 1:00 PM, a responsible

adult was not available to accompany APHIS officials during the inspection

process. When APHIS officials contacted Mr. Keeler by telephone at that time,

he did not answer. After waiting at the facility for approximately 30 minutes,

APHIS officials contacted Mr. Keeler's wife who informed them he was not

home and she was unsure when he would return. Exhibit R.

80.     On or about April 7, 2023, at approximately 4:03 PM, a responsible

adult was not available to accompany APHIS officials during the inspection

process. When APHIS officials contacted Mr. Keeler by telephone at that time,

he informed them he was unavailable to conduct an inspection that day. Exhibit

S.

81.     On or about May 18, 2023, at approximately 2:11 PM, a responsible

adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he did not answer. The APHIS officials left a message and waited 30 minutes at the facility. *See* Exhibit T.

82.     On or about July 7, 2023, at approximately 2:15 PM, Mr. Keeler refused to allow APHIS officials to inspect the cats and kittens who were found on June 29, 2023, to be living in unsanitary conditions and some of whom were found either without water or without food. APHIS officials requested access to the building where the cats and kittens were located to check on the health and wellbeing of the animals several times, but Mr. Keeler stated that, if they entered the building, they would be trespassing. *See* Exhibit W.

83.     On or about July 18, 2023, at approximately 8:55 AM, a responsible adult was not available to accompany APHIS officials during the inspection process. When APHIS officials contacted Mr. Keeler by telephone at that time, he stated he was unavailable for an inspection. *See* Exhibit X.

II.     **Even Keel Exotics Has Violated the AWA by Failing to Maintain Complete and Accurate Records Required to be Kept by the AWA and its Regulations.**

84.     Defendant is failing to maintain complete and accurate records concerning each animal at his facility.

85.     On or about March 2, 2021, APHIS officials identified that records of

acquisition, and the record of animals on hand were not available at the time of inspection at the facility. APHIS officials also noted that there were numerous disposition records for animals including capybara, kinkajou, mink, and fox, that did not have corresponding acquisition records. Exhibit A at 2.

86.     On or about June 29, 2023, APHIS officials identified that disposition records were either illegible or incomplete by missing the address, name of the person whom animals were sold to, or the species sold. Exhibit V at 2.

**III.   Even Keel Exotics Has Violated the AWA by Failing to Make Potable Water Available as Necessary for the Health and Comfort of Each Animal as Required by the AWA and its Standards.**

87.     Defendant is failing to make potable water available as necessary for the health and comfort of each animal at his facility.

88.     On or about January 11, 2022, APHIS officials observed that one capybara did not have any drinking water. When the capybara was offered water, it drank excessively for approximately 40 seconds. The water receptacle for two capybara was dry and full of shavings. APHIS officials also observed a rabbit without any drinking water. The rabbit's water dish was dry and full of shavings. When the rabbit was offered water, it drank excessively for approximately one minute. APHIS officials also noted that a hog did not have drinkable water. *See* Exhibit F at 2-3.

89.     On or about March 8, 2022, APHIS officials identified one African

crested porcupine without any drinking water. When the porcupine was offered water, it drank excessively for a minimum of two minutes. *See* Exhibit H at 2.

90.     On or about April 20, 2022, APHIS officials identified that the water receptacle for a cavy was not accessible. Exhibit J at 3-4.

91.     On or about June 29, 2023, APHIS officials noted the water bottles for three prairie dogs, one kinkajou, and approximately 100 sugar gliders had black and green organic material growing in them. APHIS officials also noted that all water receptacles for five adult cats and eight kittens were either empty or not potable due to contaminating material including hair and algae in the water receptacles. Exhibit V at 3,5.

92.     The lack of water can cause dehydration, distress, heat, and even death. Dirty water bottles can contaminate the water inside and lead to unnecessary animal disease.

**IV. Even Keel Exotics has violated the AWA by Failing to Provide Each Animal with Adequate Veterinary Care as Required by the AWA and its Regulations.**

93.     Defendant is failing to provide each animal at the Even Keel Exotics facility with adequate veterinary care.

94.     On or about August 19, 2021, APHIS officials identified two 12-week-old male red foxes and one 6-week-old male red fox with hair loss and crusting on different areas of their bodies. The tip of the right ear of one male

cavy was also affected with fly strike, with flies observed in the wound. APHIS officials noted the attending veterinarian previously prescribed methods to address fly strike, however, Defendant had not recently applied the product. Exhibit B at 2.

95.     On or about April 20, 2022, APHIS officials identified two bottles of Clavamox, one bottle of Draxxin, and one box of famotidine that were expired. Exhibit J at 2.

96.     On or about June 29, 2023, APHIS officials observed one adult female Bengal cat that was very thin with prominent hip bones and significant abdominal tuck nursing four kittens. The cat was observed shaking its head while eating, had scabs located on the outside of both ears, and numerous areas of hair loss on its head. APHIS officials also observed one pig with crusting and scabs, consistent with fly strike, on its left ear. Exhibit U at 2.

## V. Even Keel Exotics has violated the AWA by Failing to Maintain Safe and Sanitary Conditions and Facilities as Required by the AWA and its Regulations.

97.     Defendant is failing to maintain safe and sanitary conditions for the animals.

98.     On or about January 11, 2022, APHIS officials observed excessive fecal build-up in numerous animal enclosures at Defendant's facility, including an enclosure housing one kinkajou and three enclosures housing approximately

18 sugar gliders total. One of the sugar glider enclosures also contained a PVC pipe and a wooden rod that were excessively covered in fecal material. Exhibit F at 3.

99.    On or about April 20, 2022, APHIS officials observed that three hedgehog enclosures, housing a total of 11 hedgehogs, had excessive fecal build-up, and numerous fruit flies were observed. Exhibit J at 4.

100.   On or about June 29, 2023, APHIS officials observed that the four primary enclosures for five adult cats and eight kittens had nearly the entire floor space covered in dirt, urine, and smeared, dried feces. Each enclosure also had one or more piles of feces on the floor. Exhibit U at 3-4.

101.   APHIS officials also inspected the back room of the large barn used to house 4 red foxes, 9 skunks, 20 prairie dogs, and 100 ground squirrels. APHIS officials observed that fly strips in the room were completely full of flies. Numerous flies were seen in and around the food and food receptacles for the animals. Most of the perimeter of the room, at the base of the walls, had excessive mouse feces mixed with discarded wood shavings. Exhibit V at 5-6.

102.   Defendant is also failing to properly maintain facilities for the animals.

103.   On or about March 2, 2021, APHIS officials observed a broken, or chewed area in the back left of the hedgehog enclosure which could cause the

hedgehog to get stuck in the opening, or to escape the enclosure. In addition, APHIS officials noted the facility lacked a perimeter fence for a muntjac and four Patagonian cavy housed outside. Exhibit A at 4.

104.   On or about August 19, 2021, APHIS officials noted that one male wallaby escaped from its enclosure and was missing for 48 hours before being captured and returned. APHIS officials also noted a strong ammonia odor was present in the hedgehog house and front room of a barn in the facility. APHIS officials noted that excessive ammonia odors can cause eye and respiratory irritation leading to unnecessary animal pain and suffering for the animals living in the facility. In addition, APHIS officials noted the facility lacked a perimeter fence for two Patagonian cavy, a red kangaroo, two zebu, and three African crested porcupines housed outside. Exhibit B at 3.

105.   On or about January 11, 2022, APHIS officials observed an index card on top of a hedgehog case which stated "unknown (found on floor)." APHIS officials subsequently learned from an employee of Even Keel Exotics that the employee had found a hedgehog running loose in the building when she arrived for work on December 3, 2021. Exhibit F at 2-3.

106.   On or about April 20, 2022, APHIS officials observed two areas that had sharp points in the African crested porcupine enclosure, including a piece of wood chewed by the porcupine exposing several screws and a wire that had

been cut. During the inspection, APHIS officials also observed that an approximately four-inch board was missing directly in front of the fox den. APHIS officials noted that the missing board may cause an injury to the fox kits if they fall out of the fox den as the den is situated on a shelf approximately two feet off the floor. Exhibit J at 2-3.

107.   During the April 2022 inspection, APHIS officials also noted that the African crested porcupines housed outside did not have a perimeter fence and a variance was denied in December 2021. Inspectors noted that the lack of a perimeter fence can lead to unnecessary animal escapes and, without a fence, there is no mechanism to prevent contact between humans and animals contained at the facility to prevent injury or disease. *Id.* at 3.

108.   On or about May 13, 2022, APHIS officials observed that a four-inch board was missing directly in front of the fox den. APHIS officials noted that because the fox den is situated approximately two feet off the floor, the missing board may cause an injury to the fox kits if they fall out of the den. Exhibit L at 2.

109.   On or about June 29, 2023, APHIS officials observed that an outdoor enclosure, housing two pigs, had approximately four areas where the underground fencing was exposed. APHIS officials observed that, in two of the areas where fencing was exposed, the wire was broken, creating sharp points. In

the other two areas, the fence was exposed enough so that the hooves of the pigs could get entangled in the fencing. The APHIS officials also noted that on or about October 14, 2022, one wallaby escaped from its enclosure. APHIS officials noted that animal escapes can lead to animal distress, injury, or death. Exhibit U at 4.

110.   During the June 29, 2023 inspection, APHIS officials also observed unlabeled bags of food on the cement floor, open bags of food, and pieces of kibble and biscuits littered around the bags of food. Inspectors further observed the refrigerator and freezer had old, dried, and liquid blood with a very strong odor of decay. Exhibit V at 4.

111.   During the June 29, 2023 inspection, APHIS officials also observed a strong odor of ammonia in the barn that houses approximately 3 prairie dogs, 150 sugar gliders, 3 kinkajous and 20 hedgehogs. When APHIS officials mentioned the smell to Defendant, he agreed and stated that a window that should be open was shut. APHIS officials noted that inadequate ventilation can lead to unnecessary respiratory disease and that indoor housing facilities must be adequately ventilated by natural or mechanical means to provide for the health and to prevent discomfort of the animals at all times. *Id.*

112.   During the June 29, 2023 inspection, APHIS officials observed that the primary enclosure for the zebu did not have a shelter to provide protection

from inclement weather and prevent discomfort. APHIS officials also noted that a section of the perimeter fence on the west side of the facility had a very large overgrowth of vegetation. APHIS officials noted that this overgrowth could compromise the integrity of the fence and provide a means for animals or people to gain entry into the facility. *Id*. at 4-5.

**VI**. **Even Keel Exotics has violated the AWA by Failing to Meet Minimum Standards for Handling Each Animal as Required by the AWA and its Regulations.**

113.    On or about August 22, 2021, Defendant failed to maintain sufficient distance and barriers between a black fox and the public during a public exhibit, which resulted in a black fox biting a child. Exhibit C.

114.    On or about June 29, 2023, APHIS officials noted that Defendant had posted a photo on his Facebook page on or about September 27, 2022, which showed a young wallaby and read "Book an Animal Encounter this weekend and meet our newest ambassador: Nori the baby wallaby! Tickets available through the website." In the photo, a customer is shown holding the young wallaby and a small child's hand is reaching to pet the animal. *See* photo below. During the June 29, 2023 inspection, Mr. Keeler confirmed the event occurred. Exhibit U at 2.



115.   APHIS officials noted the baby wallaby was too young to be handled by members of the public, as evidenced by its small size and appearance and haircoat. Because of its young age, APHIS officials noted the animal was at risk of hypothermia and stress from over-handling. *Id.*

116.   APHIS officials also noted an interview with a reporter from 13ABC news on December 9, 2022, where Mr. Keeler is seen handling a capybara. APHIS officials observed that, during the interview, the capybara is recorded to be non-weight-bearing on his right forelimb. Despite this obvious lameness, Mr. Keeler attempted to re-position the capybara. APHIS officials noted that in the

video Mr. Keeler can be seen and heard struggling with the capybara. Inspectors noted Mr. Keeler recognized the animal did not want to be handled, however, he continued to struggle with the animal for an additional 10-15 seconds, resulting in the animal suffering from a bloody nose from hitting his nose on the ground during the struggle. *Id.* at 2-3.

**VII. Even Keel Exotics Has "Harmed" and "Harassed," Thereby Taking Endangered Ring-Tailed Lemurs in Violation of the ESA.**

117.    Upon information and belief, Defendant has in its animal inventory six endangered ring-tailed lemurs, including a pup born on May 21, 2023. *See id.* at 5.

118.    Upon information and belief, Defendant houses the six ring-tailed lemurs together. However, Defendant has removed and will continue to remove the lemur pup to interact with employees and members of the public.

119.    Ring-tailed lemurs are extremely social animals and usually reside in a stable group called a conspiracy.  Baby ring-tailed lemurs are carried by their mothers, are typically weaned at around four months of age, and remain with their mother and social group for 2.5 years to life.

120.    Removal of a ring-tailed lemur from its social group, even for a brief period of time, can cause a reshuffling of the social structure causing the briefly removed ring-tailed lemur to be ousted from or even attacked by the conspiracy. Temporary and permanent premature separation of neonatal and juvenile ring-

33

tailed lemurs from their mothers is known to cause stress-induced physiological and behavioral problems, reproductive health problems in the mother, and abnormal levels of aggression in the young lemur.  Ring-tailed lemur pups who are separated from their group are never taught social norms and can grow to be aggressive and incompatible with other ring-tailed lemurs.

121.   Public handling of a lemur may also result in trauma, aggression, and infectious disease transfer between the person(s) handling the lemur and the animal. Ring-tailed lemurs are susceptible to certain viral, bacterial, and other pathogens that can result in lemur death, and are at increased risk when in casual contact with humans, when appropriate personal protective equipment and hygiene practices are not used, and when housed where direct or indirect contact with domestic cats occurs.

122.   Defendant posted an advertisement for Baby Animal Day, which was scheduled for July 22, 2023.[5] The Even Keel Exotics website stated that members of the public can "hold and interact with our babies! Foxes, wallabies, lemurs, etc)." https://www.evenkeelexotics.com/#/baby-animal-day (last visited on July 18, 2023).

123.   Defendant's advertisements for Baby Animal Day also showed the

---

[5] On July 20, 2023, Defendant updated the Even Keel Exotics Facebook page to say that: "Due to circumstances beyond our control Baby Animal Day has been cancelled for 7/22."

lemur pup separated from its mother and group. *See* photo below.





124.   Defendant has also attempted to sell the lemur pup, stating that Defendant will remove the lemur pup and put the animal on the bottle, rather than allowing the lemur pup to continue nursing, so that the animal can be sold for $3,500. *See* photo below.



BABY RING-TAIL LEMUR

Born on 5/21/2023

Currently with the group but can be put on the bottle
if desired. Must stay in the state of Michigan. $3500

125.    These actions constitute harm and harassment of Defendant's ring-

tailed lemur pup and the pup's mother within the meaning of the ESA take

prohibition.

## CLAIMS FOR RELIEF

### <u>Claim 1</u>
**Injunctive Relief: Failure to provide access to inspect records, property,
and animals in violation of 9 C.F.R. § 2.126.**

126.    The United States incorporates by reference all allegations of the

Complaint.

127.    As set forth above, Defendant is violating the AWA and its

implementing regulations and standards by failing to provide APHIS officials

with access to inspect records, property, and animals at his facility in violation

of 9 C.F.R. § 2.126.

128.    Unless enjoined, Defendant will continue to violate the AWA, and its

regulations and standards, causing needless suffering and possibly the death of

animals at his facility.

36

129.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

## Claim 2
### Injunctive Relief: Failure to maintain complete and accurate records in violation of 9 C.F.R. § 2.75(b)(1), 9 C.F.R. § 2.80, and 7 U.S.C. § 2140.

130.   The United States incorporates by reference all allegations of the Complaint.

131.   As set forth above, Defendant is violating the AWA and its implementing regulations and standards, by failing to maintain complete and accurate records in violation of 9 C.F.R. § 2.75(b)(1), 9 C.F.R. § 2.80, and 7 U.S.C. § 2140.

132.   Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering and possibly the death of animals at his facility.

133.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

## Claim 3
### Injunctive Relief: Failure to make potable water available as necessary for the health and comfort of each animal in violation of 9 C.F.R. § 3.10(b), 9 C.F.R. § 3.10(c), 9 C.F.R. § 3.55, and 9 C.F.R. § 3.130.

134.   The United States incorporates by reference all allegations of the

Complaint.

135.   As set forth above, Defendant is violating the AWA and its implementing regulations and standards by failing to make potable water available as necessary for the health and comfort of each animal in violation of 9 C.F.R. § 3.10(b), 9 C.F.R. § 3.10(c), and 9 C.F.R. § 3.130.

136.   Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering and possibly the death of animals at his facility.

137.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

### Claim 4
**Injunctive Relief: Failure to provide adequate veterinary care in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. § 2.40.**

138.   The United States incorporates by reference all allegations of the Complaint.

139.   As set forth above, Defendant is violating the AWA and its implementing regulations and standards by failing to provide the animals at his facility with adequate veterinary care in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. § 2.40.

140.   Unless enjoined, Defendant will continue to violate the AWA, and its

regulations and standards, causing needless suffering and possibly the death of animals at his facility.

141.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

**<u>Claim 5</u>**
**Injunctive Relief: Failure to maintain safe and sanitary conditions and facilities in violation of 7 U.S.C. § 2143(a)(1), (2), 9 C.F.R. § 3.125(a), (c), 9 C.F.R. § 3.126(b), 9 C.F.R. § 3.127(b), (d), 9 C.F.R. § 3.131(c), (d) and 9 C.F.R. § 3.75(e).**

142.   The United States incorporates by reference all allegations of the Complaint.

143.   As set forth above, Defendant is violating the AWA and its implementing regulations by exposing the animals at his facility to unsafe and unsanitary conditions in violation of the AWA and its implementing regulations in violation of 7 U.S.C. § 2143(a)(1), (2), and 9 C.F.R. §§ 3.125(a), (c), 3.126(b), 3.127(b), (d), 3.131(c), (d), 3.75(e).

144.   Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering and possibly the death of animals at his facility.

145.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing

regulations and standards. 7 U.S.C. § 2146(c).

**Claim 6**
**Injunctive Relief: Failure to meet minimum standards for handling in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. § 2.131(b).**

146.    The United States incorporates by reference all allegations of the Complaint.

147.    As set forth above, Defendant is failing to meet the minimum standards for handling animals in violation of the AWA and its regulations and standards in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. § 2.131(b).

148.    Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering and possibly the death of animals at his facility.

149.    The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

**CLAIM 7**

**Defendant Violated and Will Continue to Violate the AWA by Placing the Health of His Animals in Serious Danger.**

150.    The United States incorporates by reference all allegations of the Complaint.

151.    Defendant is placing the health of the five adult cats and the eight known kittens at the Even Keel Exotics facility in serious danger in violation of

the AWA and its regulations and standards. 7 U.S.C. § 2159(a).

152.   Defendant is placing the health of at least one cat and her kittens in serious danger by failing to provide adequate veterinary care in violation of 9 C.F.R. § 2.40(b)(3). *See* Exhibits U-V.

153.   Defendant is placing the health of the cats and kittens in serious danger by failing to provide adequate nutrition and potable water, in violation of 9 C.F.R. §§ 3.9(a) and 3.10(b).

154.   Defendant is placing the health of the cats in serious danger by exposing them to unsanitary conditions in violation of 9 C.F.R. §§ 3.6(b)(3) and 3.11(a).

155.   Unless enjoined, Defendant will continue to place the health of these animals in serious danger in violation of the AWA and its regulations and standards.

156.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2159(b).

**Claim 8**
**Injunctive Relief: Defendant Violated the ESA by Unlawfully "Taking"**
**Protected Ring-Tailed Lemurs By Prematurely Separating a Lemur Pup and**
**Mother and Forcing the Lemurs to Interact with the Public.**

157.   Plaintiff incorporates by reference all allegations of the Complaint.

158.   Defendant has violated and will continue to violate the ESA, 16

U.S.C. § 1538(a)(1)(B), (G), and its implementing regulations, 50 C.F.R. §§ 17.11(h), 17.21(a), (c)(1), 17.31(a), (c), by harming and harassing and, thereby, taking ESA-protected lemurs by prematurely separating ring-tailed lemur pups and mothers for public exhibition and for sale without a permit.

159.     Unless enjoined, Defendant will continue to prematurely separate ESA-protected lemur pups and their mothers for encounters with the public.

160.     Unless enjoined, Defendant will permanently separate the ESA-protected lemur pup and its mother by selling the pup and will likely continue to separate ESA-protected lemur pups from their mothers in the future.

161.     The United States is entitled to an injunction enjoining Defendant from committing further ESA violations and ordering Defendant to relinquish possession of the taken ESA-protected lemurs to the United States. 16 U.S.C. §§ 1540(c), 1540(e)(4)(A), 1540(e)(6).

**<u>Claim 9</u>**
**Defendant Violated and Will Continue to Violate the ESA by Possessing Unlawfully "Taken" ESA-Protected Lemurs.**

162.     Plaintiff incorporates by reference all allegations of the Complaint.

163.     Defendant has violated and will continue to violate the ESA, 16 U.S.C. § 1538(a)(1)(D), (G), and its implementing regulations, 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), 17.40(b), (r), by possessing unlawfully taken ESA-protected animals.

164.     Unless enjoined, Defendant is likely to continue to possess unlawfully taken animals in violation of the ESA.

165.     The United States is entitled to a permanent injunction enjoining Defendant from possessing any taken ESA-protected animals and ordering Defendant to relinquish possession of the ESA-protected animals to the United States. 16 U.S.C. §§ 1540(c), 1540(e)(4)(A), 1540(e)(6).

**Claim 10**
**Injunctive Relief: Defendant Violated the ESA by Attempting to Sell a Taken Ring-Tailed Lemur Pup.**

166.     Plaintiff incorporates by reference all allegations of the Complaint.

167.     Defendant has violated and will continue to violate the ESA, 16 U.S.C. § 1538(a)(1)(D), (g), and its implementing regulations, 50 C.F.R. §§ 17.11(h), 17.21(a), (d)(1), by attempting to sell an unlawfully taken endangered ring-tailed lemur pup.

168.     Unless enjoined Defendant will sell the endangered ring-tailed lemur pup as has been advertised on the Even Keel Exotics website.

169.     The United States is entitled to an injunction enjoining Defendant from selling the endangered ring-tailed lemur pup. 16 U.S.C. § 1540(e)(6).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Declare that Even Keel Exotics has violated and continues to violate the AWA, 7 U.S.C. § 2143(a)(1), (2), and its implementing regulations and

43

standards;

2. Declare that Even Keel Exotics has violated and continues to violate the AWA, 7 U.S.C. § 2140, and its implementing regulations and standards;

3. Declare that Defendant has violated and continues to violate the AWA by placing the health of certain animals in serious danger. 7 U.S.C. § 2159;

4. Preliminarily and permanently enjoin and restrain Even Keel Exotics from violating the AWA, 7 U.S.C. § 2146(c);

5. Preliminarily enjoin Even Keel Exotics from engaging in activity regulated by the AWA unless and until Even Keel Exotics comes into compliance with the AWA and the terms of the injunction;

6. Declare that Even Keel Exotics has violated the ESA by illegally taking protected ring-tailed lemurs.  16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.11(h), 17.21(a), (c)(1);

7. Declare that Even Keel Exotics has violated the ESA by possessing protected animals, who have been illegally taken.  16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.11(h), 17.21(a), (d)(1);

8. Declare that Even Keel Exotics has violated the ESA by attempting to sell an unlawfully taken ring-tailed lemur, 16 U.S.C. § 1538(g), 50 C.F.R. §§ 17.11(h), 17.21(a), (d)(1);

9. Preliminarily and permanently enjoin and restrain Even Keel Exotics from taking endangered ring-tailed lemurs, including by prematurely separating ring-tailed lemur pups from their mothers;

10. Preliminarily and permanently enjoin and restrain Even Keel Exotics from selling, delivering, carrying, transporting or shipping unlawfully taken ring-tailed lemurs;

11. Permanently enjoin and restrain Even Keel Exotics from possessing any unlawfully taken ring-tailed lemurs and forfeit or transfer those unlawfully taken animals to the United States;

12. Award the United States its costs in this action; and

13. Grant other relief that the Court deems just and proper.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Mary Hollingsworth*
MARY HOLLINGSWORTH
Senior Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
211 W. Fort Street, Rm 2353
Detroit, MI 48226
Mary.hollingsworth@usdoj.gov
Phone: (202) 598-1043
Arizona Bar No. 027080

CHRISTIAN H. CARRARA
Trial Attorney
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Christian.carrara@usdoj.gov
Phone: (202): 598-9736
Fax: (202) 305-0275
New Jersey Bar No. 317732020

Dated: July 20, 2023                         *Attorneys for the United States of America*